**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

NANCY BELL, a/k/a Nancy
Hartsock,

*Defendant-Appellant.*

No. 10-4644

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

IRIS GIBSON,

*Defendant-Appellant.*

No. 10-4651

Appeals from the United States District Court
for the Western District of Virginia, at Big Stone Gap.
James P. Jones, District Judge.
(2:09-cr-00021-jpj-pms-1; 2:09-cr-00021-jpj-pms-2)

Argued: October 27, 2011

Decided: December 21, 2011

Before DAVIS and FLOYD, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Vacated and remanded by published opinion. Judge Davis wrote the opinion, in which Judge Floyd and Senior Judge Hamilton joined except as to footnote 8. Senior Judge Hamilton wrote an opinion concurring in part and concurring in the judgment, in which Judge Floyd joined.

---

**COUNSEL**

**ARGUED:** Brian Jackson Beck, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Abingdon, Virginia; Michael Allen Bragg, Abingdon, Virginia, for Appellants. Zachary T. Lee, OFFICE OF THE UNITED STATES ATTORNEY, Abingdon, Virginia, for Appellee. **ON BRIEF:** Larry W. Shelton, Federal Public Defender, Roanoke, Virginia, for Appellant Nancy Bell. Timothy J. Heaphy, United States Attorney, Roanoke, Virginia, Jennifer R. Bockhorst, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Abingdon, Virginia, for Appellee.

---

**OPINION**

DAVIS, Circuit Judge:

Appellants Nancy Bell and Iris Gibson (Bell's daughter) pled guilty without a plea agreement to several counts arising out of a conspiracy to distribute oxycodone pills. On appeal, they challenge the drug quantities from which the district court calculated their base offense levels under the Sentencing Guidelines, primarily because (1) Bell obtained the pills with a valid prescription and consumed some of the pills herself, and (2) the evidence of actual drug trafficking consisted of co-conspirator testimony of uncertain reliability. Having fully considered the parties' contentions, we are persuaded that, because the district court failed to explain adequately its methodology for calculating drug quantity and otherwise to

make findings sufficient to permit appellate review of Appellants' sentences for procedural reasonableness, we must vacate the judgments and remand for resentencing.

I.

A.

At least since 2002, Bell, who is sixty-five years old, has suffered from several back ailments, including sacroiliitis (inflammation of the joints between the spine and pelvis), lumbar radiculitis (inflammation of lumbar nerve roots), and a protrusion of one of her lumbar discs. She also suffers from occasional breakouts of shingles. Since 2002 she has received treatment for the pain resulting from those ailments at the Pain Management Center at St. Mary's Medical Center in Knoxville, Tennessee. Doctors at St. Mary's have prescribed Bell several narcotic pain relievers over the years, including OxyContin for "long-acting relief" and Percocet for "breakthrough pain." J.A. 276. At issue here is the OxyContin, a brand name version of oxycodone, the distribution of which in certain circumstances is unlawful.[1]

Beginning in or before January 2004 through April 2006, Bell was prescribed ninety 20-mg OxyContin tablets per month. In May 2006 her prescription was changed from 20-mg to 40-mg pills, at first sixty pills per month and then, beginning in June 2006, ninety pills per month. She continued to be prescribed ninety 40-mg OxyContin pills per month through August 2009.[2] Because oxycodone is a controlled

---

[1]Bell also suffers from atherosclerotic heart disease, insulin-dependent diabetes, severe asthma and other conditions. Those conditions do not appear to have been part of the reason Bell was prescribed pain medications. They were, however, relevant at sentencing, and led the district court to recommend that her term of imprisonment be served at a federal medical facility.

[2]In fact she continued to receive oxycodone prescriptions after August 2009, but the probation officer used that date as the cut-off for calculating drug quantity in this case.

substance, she was required to undergo periodic "urine screens" and "pill counts" to ensure she was consuming the drug. J.A. 276. There is evidence in the record of several urine screens, the results of most of which were "satisfactory" or "appropriate," indicating that Bell was consuming at least some of the oxycodone. One urine screen described in the record, sometime prior to May 2004, was "low." All her pill counts have been accurate. Indeed, her nurse at St. Mary's wrote that Bell "has an outstanding record with our pain center." *Id.*

It turns out, though, that Bell was not consuming all of the oxycodone pills she was prescribed. Instead, she was selling a substantial number of them unlawfully and using much of the money she received to buy lottery tickets. Specifically, as the evidence at sentencing showed, twice a month Bell would travel from her home in Marnardsville, Tennessee, to Jonesville, in Lee County, Virginia, where Gibson lived and where they would either sell oxycodone pills for cash or front the pills to others who would sell them and return to Bell or Gibson with the proceeds.

Law enforcement eventually learned of the scheme and used a confidential informant to make three controlled purchases from Bell and Gibson at Gibson's residence in Lee County, buying a total of ten 40-mg oxycodone pills. Officers then obtained a search warrant for Gibson's home, a trailer in the Horton subdivision of Lee County, and executed the warrant on July 30, 2009. Agents found a pill bottle for OxyContin in Bell's name with fifteen 40-mg OxyContin tablets and thirteen Endocet tablets (a combination of acetaminophen and oxycodone), and $1,776 in cash. They found two more 40-mg OxyContin pills and five more Endocet pills in Bell's purse, which was in Gibson's residence at the time of the search.

Five months later, on December 16, 2009, a federal grand jury returned an indictment charging Bell, Gibson and six others with conspiracy to possess with intent to distribute oxyco-

done from January 1, 2004 to December 14, 2009, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). Bell and Gibson were also charged with three counts of distributing oxycodone in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and one count of maintaining or using a drug house in violation of 21 U.S.C. § 856(a)(1) between June 1, 2009 and July 30, 2009. They were arrested on December 22, 2009, and each was released on bond.

In due course, Gibson pled guilty to each count of the indictment without a plea agreement, followed by Bell shortly thereafter.

B.

In anticipation of sentencing, pre-sentence reports ("PSRs") were prepared for Bell and Gibson. The principal consideration in calculating the base offense level under the Sentencing Guidelines was the quantity of drugs attributable to the conspiracy. To determine that number, the probation officer relied primarily on the prescriptions through which Bell received her oxycodone pills. As stated above, from January 2004 to April 2006 (27 months) Bell received ninety 20-mg pills per month, a total of 2,430 pills with a total weight of 48.6 grams. In May 2006 she received sixty 40-mg pills, with a total weight of 2.4 grams. From June 2006 to August 2009 (38 months) she received ninety 40-mg pills per month, a total of 3,420 pills with a total weight of 136.8 grams. The total weight of all the oxycodone pills Bell was prescribed from January 2004 to August 2009 was 187.8 grams, equivalent to 4,695 40-mg pills.

Under the Sentencing Guidelines, 1 gram of oxycodone is designated as equivalent to 6,700 grams of marijuana for sentencing purposes. U.S.S.G. § 2D1.1, cmt. n.10(E) (2009). Thus during the period of the conspiracy as alleged, Bell was prescribed and received the oxycodone equivalent of 1,258.26 kilograms of marijuana. This number yielded a base offense

level of 32, the level that applies to marijuana weights between 1,000 and 3,000 kilograms. *See id.* § 2D1.1(c)(4). The probation officer recommended a three-point upward adjustment for Bell's role in the offense and a three-point downward adjustment for acceptance of responsibility, resulting in a total offense level of 32. With a criminal history category of I, the advisory range for a term of imprisonment was 87 to 108 months.

The probation officer noted in the PSR that Bell may have been distributing some pills other than those prescribed to her, namely pills prescribed to her husband, William Bell. She and William separated in 1992 but, according to the PSR, "remain good friends." J.A. 495. The probation officer did not consider these pills in calculating drug weight, however, because, although "agents suspect[e]d" the defendants were also selling pills prescribed to William, the government could not "prove this theory." J.A. 491.

The Appellants objected to the drug weight calculation in the PSR on several grounds. Principally, Bell argued the government could not prove she distributed or intended to distribute all the pills prescribed to her because her medical records showed that she was taking a "significant amount" of the oxycodone that had been prescribed. J.A. 120. She also argued that any testimony from the conspiracy's largest buyers, Kim Smith and Tim Pace, should be disregarded because of irreconcilable inconsistencies in their statements to investigators. Finally, Bell argued that the government could not prove that she distributed any pills prescribed to William Bell; the only pills the court should consider, therefore, were those prescribed to her. Given these constraints, the Appellants calculated the total number of pills distributed by the conspiracy as 888 40-mg pills, or 35.52 grams, equivalent to 238 kilograms of marijuana. Because Bell did not object to the three-level increase for her role in the offense, this weight would yield base and total offense levels of 26 and an advisory imprisonment term of 63 to 78 months.

Bell also urged the court to depart downward from the Guidelines and impose probation instead of a term of imprisonment because of her age and many health problems.

C.

At the sentencing hearing the government sought to establish the quantity of drugs attributable to the conspiracy in two ways: (1) through documentation of the pills prescribed to Bell, and (2) through the testimony of co-conspirators who purchased drugs from Bell and Gibson. The theory was that the prescriptions proved the conspiracy's supply, and the witnesses' testimony demonstrated that Bell and Gibson sold to co-conspirators a sizeable portion of the pills prescribed to Bell.

The Appellants did not dispute that from January 2004 to August 2009 Bell was prescribed and received 2,430 20-mg oxycodone pills and 3,420 40-mg pills. They did dispute, however, whether they agreed to posses with intent to distribute or to distribute all of those pills. As stated above, their position was that the government could only prove they sold 888 40-mg pills during the course of the conspiracy, and therefore could only prove that they conspired to possess with intent to distribute that quantity.

Six co-conspirators testified at the sentencing hearing. Because the testimony of these witnesses figures prominently in the issues presented, we set forth the testimony in some detail.

The largest sales were to the first two witnesses, Kimberly Smith, a relative of Bell through marriage, and her fiancé Timothy Pace, who were each long-time oxycodone addicts. On direct examination, Smith testified that from July 2005 to January 2007 she received 30 to 60 40-mg oxycodone tablets from Bell twice a month. At first she was just buying pills for herself; after a "couple [of] months" she began selling some

of the pills she acquired from Bell to others in order to make money to buy pills for herself. J.A. 325. On cross-examination, however, she admitted that before May 2006 she received 20-mg pills, not 40-mg pills, and that she had suppliers other than Bell, although she did not know their names. She admitted that sometimes Gibson was absent when she purchased pills from Bell.

Pace largely corroborated this testimony, though he put the twice-monthly range he and Kim received "to sell" from mid-2005 through 2006 at 30 to 50 40-mg pills. He also admitted that sometimes he and Smith did not buy from Bell but rather from other suppliers. When asked by the government whether he was "selling OxyContin with anybody else" or rather was "acting on [his] own" he replied, "No, it was me and my fiancée." J.A. 346. When asked whether he and Kim would "sell pills together or . . . split them up" he replied, "No, we was together." J.A. 349. On cross-examination he also explained that, either included in or in addition to the 30 to 50 pills twice a month they received "to sell," he and Kim received 12 to 20 pills "or a little less" twice a month for their own use. He also testified that he saw pill bottles with William Bell's name on them, prescribed for 90 40-mg pills per month.

The next two witnesses were a married couple, Joyce and Timothy Hopkins, also both long-time addicts. Joyce testified that in early 2007 she bought two oxycodone pills from Gibson, possibly continuing twice per month. Six to eight months later she was buying 5 to 10 40-mg pills and later 10 to 15 40-mg pills twice per month. At first she purchased pills from Gibson; in late 2007 she purchased pills from Bell. On cross-examination, she admitted to sometimes receiving 80-mg oxycodone pills from another supplier. She continued to buy pills until she was arrested in March 2009.

Timothy testified that he and Joyce did not begin buying oxycodone pills from Bell until "two and a half years . . . or so" before the sentencing hearing, which would be the winter

of 2007-2008, J.A. 384; this was inconsistent with Joyce's testimony that they first purchased from Bell in early 2007. His testimony as to the monthly amounts was that he and Joyce started buying no more than 10 40-mg pills and later increased to 10 to 15 40-mg pills, but apparently just once (not twice) per month. Although the government encouraged him to testify that he received 20 pills per month, he insisted it was "[t]en, 15, something like that." J.A. 386. He also testified that some months he did not have money to buy any pills. J.A. 390. He stopped buying pills from the defendants in March 2009, when he was arrested. The testimony is unclear as to whether he and Joyce were buying together and thus were referring to the same pills.

The government's fifth witness, Leslie Clasby, testified that she bought oxycodone from Bell for four months, from October 2008 until sometime between January and March 2009. She would purchase up to 20 40-mg pills during a month but "[s]ometimes not that many." J.A. 394, 397. When the district court asked her to clarify, she said that for four months or "possibly longer" she purchased up to 20 pills per month. J.A. 396. But on cross-examination she admitted that there were times Bell was not available and so she purchased from another supplier. She also could not recall whether Bell was available around Christmas 2008.

The government's sixth witness was Misty Parker, Gibson's daughter (and Bell's granddaughter) who was twenty-two years old at the time of sentencing and had lived in a group home or foster home beginning at age 14 because her mother was deemed unfit to supervise her. According to Parker, "just about everybody in my family has a drug problem." J.A. 399. Beginning sometime in June or July 2008 she began receiving 10 to 15 pills twice a month from Bell. Although at first she resold the full amount, she soon "started using" and by August had been kicked out of Gibson's home because of her drug use. J.A. 403. She went to a rehabilitation program for a month during May to June 2009, but began using again

after she was released. She continued to receive pills from Bell until Bell's arrest in July 2009. For an unspecified period of time she sold some of her pills to Leslie Clasby and possibly to Joyce Hopkins.

Parker described her grandmother as a "a very sick woman," someone who was like a "walking pharmacy" because of all the medications she needed for her heart problems, diabetes, blood pressure and other illnesses. J.A. 408. According to Parker, Bell was not addicted to drugs, but she was addicted to gambling by buying lottery tickets, and sold oxycodone pills to support her gambling habit.

The witnesses testified that many of their purchases of oxycodone were made at Gibson's home, in a trailer park in Jonesville in the Horton Subdivision of Lee County, where Bell would stay when she visited twice a month. But other sales were made elsewhere. For example, sometimes Smith and Bell would drive to Smith's customers' homes. Smith would go up to the residence and find out how many pills the customer wanted and the customer would give Smith money for the pills. Smith would then return to the car and give some or all of the money to Bell, Bell would give Smith the pills, and Smith would deliver the pills to the customer.

Thus, to summarize the witnesses' testimony as to the amounts distributed by Bell and Gibson: (1) No one testified to buying pills earlier than July 2005 or later than July 2009.[3] (2) Pills received from Bell and Gibson before May 2006 were probably 20-mg pills; those received during or after May 2006 were probably 40-mg pills. (3) Smith and Pace received somewhere between 24 and 120 pills per month from July 2005 to January 2007 at the latest and likely were referring to the same pills (i.e., buying together). (4) Joyce Hopkins began

---

[3]The indictment charged that the conspiracy existed from on or about January 1, 2004, until on or about December 14, 2009, although the search warrant was executed at Gibson's residence in July 2009.

buying two pills per month in early 2007 (though possibly late 2007), eventually increasing to 10 to 15 pills twice per month, until her arrest in March 2009. (5) Timothy Hopkins bought 10 to 15 pills per month from late 2007 or early 2008 until March 2009 and likely bought together with Joyce and thus was referring to the same pills. (6) Clasby bought up to 20 pills per month between January and March 2009. (7) Parker bought 10 to 15 pills twice a month from June or July 2008 until July 2009, interrupted by one month in a rehabilitation program. She sold some of her drugs to Clasby, and possibly some to Joyce Hopkins.

D.

After the witnesses' testimony, counsel presented arguments on the proper Guidelines calculation. The defendants objected to the drug weight calculation, pointing to the evidence that Bell was consuming some of the pills: her positive urine screen, her frequent proper pill counts, and the letter from the St. Mary's pain center that her record there was "outstanding." Because the evidence of Bell's supply (i.e., her prescriptions) was not an accurate indicator of the amount distributed (or, by implication, the amount Bell agreed to possess to distribute), they argued, the court had to rely solely on the testimony at sentencing, and this testimony only proved by a preponderance that the defendants conspired to possess with intent to distribute a total of 80 20-mg pills and 180 40-mg pills, even less than the 888 40-mg pills the defendants had previously conceded in their written submissions the government could prove. The marijuana equivalent of that number of pills would be 58.96 kg, with a base offense level of 20 and an advisory range of 41 to 51 months imprisonment.

Gibson further argued that, whatever the total drug weight attributable to Bell, that weight should be decreased for Gibson because the evidence showed that Gibson participated in the conspiracy only beginning in May 2008. Gibson provided documentary evidence that her lease for a particular lot in a

trailer park in Jonesville did not begin until May 2008. She also provided a letter showing that she was on a lease for a different home, an apartment on Chappel Drive in Jonesville, beginning in May 2004, although the "renewal paperwork" in 2006 for that apartment did not include Gibson's name. There was no documentary evidence, however, of where Gibson lived in the two to three years before May 2008. Based on the May 2008 lease, and because the witnesses "all agreed that the activities . . . Gibson was participating in, occurred on or after a period of time that she lived there at the trailer park," Gibson argued, the district court should reject the co-conspirators' testimony insofar as they testified that Gibson and/or Bell sold drugs from Gibson's trailer in Jonesville prior to May 2008. J.A. 417. In other words, Gibson did not dispute that she helped sell drugs from her trailer, but argued that only those drugs sold in or after May 2008, a period of eleven to thirteen months, should be attributed to her.

For its part, the government sought strenuously to undermine all of the Appellants' contentions. First, the government dismissed the argument that Bell might have herself consumed some of the pills prescribed to her. "Even if Ms. Bell is taking some of the pills," the government argued, "one motivation, [if] not the over reaching [sic] motivation, for getting these OxyContins was to distribute them." J.A. 420. Moreover, the government contended, "even if a defendant is using or consuming drugs, that . . . drug weight might be attributed to him, or her." *Id.* Thus, the government argued, "the court should consider [Bell's] prescription records as an accurate or conservative drug weight amount in this case." *Id.* Those records yield a conservative estimate, the government argued, because of the evidence that she was also selling pills prescribed to her husband, William. Second, the government argued that the full amount attributable to the conspiracy should be attributed to Gibson, not just drugs obtained and distributed in or after May 2008.

After considering the parties' contentions, the district court stated its conclusions under the Guidelines. First, the court

rejected the Appellants' argument in support of a deduction from the prescribed amount for those drugs that Bell herself may have consumed, stating: "Where a drug conspiracy is involved, drugs obtained by the defendant for her personal use are properly included in the quantity of drugs that the defendant knew were distributed by the conspiracy." J.A. 424. With respect to the witnesses' testimony, the court "credit[ed] their testimony in regard to the quantity of drugs." J.A. 425. The court then concluded that "the upper level of their testimony concerning quantity of drugs is the proper amount to accept by a preponderance of the evidence, and I do that because it is corroborated by the quantity of drugs prescribed to the defendant, Bell." J.A. 425-26.

The district court did not then proceed to calculate the amounts prescribed to Bell. Nor did the court state the number of pills the government established by a preponderance of the evidence had been distributed or possessed with the intent to distribute. The court did acknowledge that "[t]here are obviously some discrepancies in the testimony of witnesses based on a lack of memory," but concluded those discrepancies were "not material." J.A. 427. Nevertheless, the court then stated, "I will partially sustain the objection of the defendant [Bell]," and concluded, "[B]ased on my acceptance of the testimony of these persons I find that the defendant Bell was responsible for distribution of at least 700 kilograms equivalency of marijuana." J.A. 426.

Although the court did not recite how it reached 700 kilograms, under the Guidelines 1 gram of oxycodone is equivalent to 6,700 grams of marijuana, and so the 700 kilogram marijuana-equivalency finding means that the court held Bell and Gibson responsible for 104.5 grams of oxycodone, or the equivalent of at least 2,612 40-mg oxycodone pills. This yielded a base offense level of 30.

The court also rejected Gibson's argument that only a portion of the total weight should be attributed to her. Although

it "[m]ay well have been that Ms. Gibson was not present at all times when the defendant Bell distributed or caused to be distributed drugs, . . . I believe it is a reasonable inference from the evidence that she had full knowledge of the scope of the conspiracy and quantity of drugs involved." J.A. 427.

Based on its determinations (as described above), the district court concluded that the final Guidelines range for Bell was 97 to 121 months and the final Guidelines range for Gibson was 70 to 87 months.

### E.

The Appellants then turned to their presentations under 18 U.S.C. § 3553(a). The government did not present additional evidence. The defense presented the testimony of Christy Parker, another of Gibson's daughters and Misty's twin sister. Among other things, she testified that her grandmother, Bell, "has diabetes, heart problems, blood pressure problems, she has back problems, [and] other things I'm not really certain on." J.A. 431. Christy testified that her grandmother was on many prescriptions, but she could not say the exact amount because "she has so many." *Id.* When asked whether she had ever seen her grandmother take oxycodone, she responded that she had, and that it was for pain. *Id.*

The government argued for sentences at the high end of the Guideline ranges. Bell's counsel argued for a sentence of probation, especially given Bell's poor health. Gibson's counsel argued for a below-Guidelines sentence as well. The district court declined to depart downward, and imposed sentences of 120 months for Bell (on all counts, concurrent) and 72 months for Gibson (on all counts, concurrent). The Appellants have timely appealed.

### II.

We review a sentence for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). We first ensure that the

district court committed no significant procedural error. *United States v. Evans*, 526 F.3d 155, 161 (4th Cir. 2008). Significant procedural errors include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall*, 552 U.S. at 51. If a sentence is procedurally reasonable, we then consider the substantive reasonableness of the sentence under an abuse-of-discretion standard, taking into account the totality of the circumstances. *Id.* A sentence within the Guidelines range may be accorded an appellate presumption of reasonableness. *Rita v. United States*, 551 U.S. 338, 346–56 (2007).

## III.

On appeal, Bell and Gibson argue the district court committed significant procedural errors by failing to properly calculate the Guidelines range, and/or failing to adequately explain how the court calculated the base offense levels. The Appellants' principal argument is that the district court erred in its calculation of the total weight of the oxycodone pills attributable to the conspiracy, from which each base offense level was determined. For the following reasons, we find merit in the Appellants' contentions and we shall remand for further proceedings.

## A.

The Sentencing Guidelines include a Drug Quantity Table that provides base offense levels that correspond to certain quantities of enumerated controlled substances. U.S.S.G. § 2D1.1(c). For controlled substances not on the Drug Quantity Table, the Guidelines include Drug Equivalency Tables, which convert the weight of the substances to an "equivalent quantity" of marijuana. *Id.* § 2D1.1, cmt. n.10(A)(ii). In conspiracy cases, base offense levels are determined based on "all

acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," *id.* § 1B1.3(a)(1)(A), as well as the "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity," which include any "criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." *Id.* § 1B1.3(a)(1)(B). In cases of jointly undertaken criminal activity involving controlled substances, the Guidelines hold a defendant "accountable for all quantities of contraband with which he was directly involved and . . . all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." *Id.* § 1B1.3 cmt. n.2. A defendant's "relevant conduct" does not, however, include the conduct of members of a conspiracy occurring prior to when the defendant joined the conspiracy, "even if the defendant knows of that conduct." *Id.*

For sentencing purposes, the government must prove the drug quantity attributable to a particular defendant by a preponderance of the evidence. *United States v. Randall*, 171 F.3d 195, 210 (4th Cir. 1999). When the drug quantity is not proven by actual seizures or comparable direct evidence, the government must present evidence from which the sentencing court may "approximate the quantity." U.S.S.G. § 2D1.4, cmt. n.2. In such cases the Guidelines do not recommend a particular method for determining quantity; any of various methods might be proper on a particular set of facts. The district court's obligation, in addition to assessing the reliability of evidence, is to choose a method for interpreting the evidence that ensures that only drug quantities proven by a preponderance are attributed to a defendant.

For example, although we have approved reliance on direct or hearsay testimony of lay witnesses as to the quantities attributable to a defendant, *see United States v. Cook*, 76 F.3d 596, 604 (4th Cir. 1996), we have cautioned that when the approximation is based only upon "uncertain" witness esti-

mates, district courts should sentence at the low end of the range to which the witnesses testified. *United States v. Sampson*, 140 F.3d 585, 592 (4th Cir. 1998); *see also* U.S.S.G. § 6A1.3(a) (policy statement) (permitting sentencing courts to rely on "relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy"). Similarly, although district courts may rely on cash amounts linked credibly to defendants' purchases or sales of narcotics and properly converted to narcotics quantities, courts using such an approach must ensure that doing so does not result in double counting of both the narcotics and the proceeds of their sale. *See United States v. Morsley*, 64 F.3d 907, 915-16 (4th Cir. 1995).

Notably, however, apart from its Guidelines calculation, in every case, "[r]egardless of whether the district court imposes an above, below, or within-Guidelines sentence, it must place on the record an 'individualized assessment' based on the particular facts of the case before it." *United States v. Carter*, 564 F.3d 325, 330 (4th Cir. 2009) (quoting *Gall*, 552 U.S. at 50). The explanation must be sufficient to allow for "meaningful appellate review," *id.* (quoting *Gall*, 552 U.S. at 50), such that the appellate court need "not guess at the district court's rationale." *Id.* at 329.

## B.

The Drug Quantity and Drug Equivalency Tables include controlled substances of all types, including those designated on Schedules I, II, III, IV and V under the Controlled Substances Act. Schedule I substances are those that have a "high potential for abuse" and "no currently accepted medical use in treatment in the United States." 21 U.S.C. § 812(b)(1). Schedule V substances, at the other end of the controlled-substances spectrum, have a currently accepted therapeutic medical use and a relatively low potential for abuse. *Id.* § 812(b)(5). As an opiate pain-relieving medication, oxycodone is a Schedule II

substance, meaning that it "has a currently accepted medical use" but "has a high potential for abuse," and its abuse "may lead to severe psychological or physical dependence." *Id.* § 812(b)(2); 21 C.F.R. § 1308.12(b)(1)(xiii).[4]

The principal distinguishing characteristic between substances on Schedule I and those on the other Schedules is that non-Schedule I substances have at least one currently accepted medical use, and therefore can be possessed and sold legally in some circumstances. For obvious reasons, Congress has expressly stated that a person may not be prosecuted for simple possession of a non-Schedule I controlled substance when the person obtained the drug "pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice." 21 U.S.C. § 844(a).

That distinction potentially becomes critical in cases where a person is convicted of conspiracy to possess with intent to distribute a controlled substance. Where there is no evidence that any of the drugs obtained by members of a conspiracy were obtained or possessed legally, all reasonably foreseeable quantities possessed by conspiracy members with intent to distribute and within the scope of the criminal activity undertaken by a particular defendant may be considered "relevant conduct" attributable to that defendant. *See, e.g.*, *United States v. Iglesias*, 535 F.3d 150, 160 (3d Cir. 2008) (holding that methamphetamine retained for personal use by the defendant, who had been convicted of conspiracy to distribute the substance and never argued any of the methamphetamine was lawfully obtained, was properly considered "contraband with which he was directly involved" and therefore "relevant conduct"); *United States v. Asch*, 207 F.3d 1238, 1243-44 (10th Cir. 2000) (same, although defendant was also convicted of conspiracy to possess with intent to distribute methamphet-

---

[4]Schedules of controlled substances are revised regularly. *See* 21 U.S.C. § 812(a). Revised schedules are published in the Code of Federal Regulations, Part 1308 of Title 21, Food and Drugs.

amine). But in a subset of non-Schedule I cases, where some or all of the drugs possessed by one or more conspiracy members were obtained and possessed pursuant to a valid prescription, that general rule potentially breaks down, because "relevant conduct" only includes "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken *criminal* activity." U.S.S.G. § 1B1.3(a)(1)(B) (emphasis added). Where, as here, a defendant has been convicted of conspiracy to possess with intent to distribute and/or to distribute a quantum of controlled substances which she lawfully obtains and possesses, although it may be tautological to say so, only those quantities the defendant conspired or intended to possess *unlawfully, i.e., with intent to distribute*, are "relevant conduct," because a defendant is only accountable for "reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." *Id.* § 1B1.3 cmt. n.2. In those cases, presuming that the full quantity possessed by conspiracy members is "contraband . . . within the scope of the criminal activity," without requiring the government to prove and without a factual finding by the district court explicating the evidence supporting that finding, creates an unacceptably high risk that a defendant will be punished for drug quantities a portion of which was lawfully obtained, possessed and consumed.

In such a case involving a valid prescription, if at sentencing the government wishes to use the total quantity prescribed to one or more conspiracy members as evidence of the quantity of "contraband . . . within the scope of the [conspiracy to possess with intent to distribute]," it must also provide evidence, and the district court must make a finding, of something more—for example (1) that the conspiracy actually distributed a particular amount; (2) that the person who was prescribed the drug lawfully kept and consumed only a portion (or none) of the prescribed amount; (3) that the pills were obtained fraudulently and thus cannot be considered to have been lawfully obtained and possessed, *see* 21 U.S.C. § 843(a)(3) (making it unlawful to "acquire or obtain posses-

sion of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge"); or (4) that "each and every pill" obtained, even if pursuant to a valid prescription, was obtained "with the intent that it would or could be distributed." *See, e.g.*, *United States v. Marks*, 365 F.3d 101, 106 (1st Cir. 2004). Without requiring such additional factual findings by a district court, where a defendant lawfully obtained 100 pills per month pursuant to a valid prescription and was proven to have sold or transferred just one, we encounter the risk of sustaining a finding that the sale of the one pill could render the possession of all 100 pills unlawful, by attributing an intent to distribute the remaining 99 pills without any proof whatsoever to support such a finding.[5]

## C.

We turn now to the facts in the case at bar. As stated above, the probation officer calculated the total amount of oxycodone prescribed to Bell from January 2004 to August 2009 as 187.8 grams, a Guidelines equivalent of 1,258.26 kilograms of marijuana, and attributed that full amount to the conspiracy. The district court did not go that far, however, instead attributing 104.5 grams of oxycodone, the Guidelines equivalent of 700 kilograms of marijuana, to the conspiracy and by extension to Bell and Gibson.[6] But the district court's explanation for how

---

[5]The government cites a string of cases for the proposition that "[d]rugs obtained by conspirators for personal use in the course of a conspiracy may be included in the drug weight." Gov't Br. at 22 (citing *United States v. Page*, 232 F.3d 536, 542 (6th Cir. 2000); *United States v. Antonietti*, 86 F.3d 206, 209 (11th Cir. 1996); *United States v. Fregoso*, 60 F.3d 1314, 1328 (8th Cir. 1995); *United States v. Snook*, 60 F.3d 394, 395 (7th Cir. 1995); *United States v. Wood*, 57 F.3d 913, 920 (10th Cir. 1995); *United States v. Innamorati*, 996 F.2d 456, 492 (1st Cir. 1993)). But the drugs in those cases were either Schedule I substances, no use of which would have been lawful, or Schedule II substances where there was no evidence that any of the drugs were obtained and/or consumed lawfully. Thus, the reasoning in those cases is inapt here.

[6]We note that the district court's 700 kilogram finding is at the very top of the drug quantity table for an offense level of 28.

it calculated that quantity is insufficient to allow for "meaningful appellate review," *Gall*, 552 U.S. at 50, as we now explain.

The principal shortcoming lies in the district court's conclusion that even if a portion of the oxycodone prescribed to Bell was lawfully possessed and consumed by her, the entire amount prescribed is "properly included in the quantity of drugs" for purposes of calculating the Appellants' sentences so long as "a drug conspiracy is involved." As explained above, non-Schedule I substances that a conspiracy member obtains, possesses, and consumes pursuant to a valid prescription generally do not constitute "relevant conduct" for sentencing purposes.

Here, there is no dispute that Bell received her pills using a valid prescription issued to her by physicians at a single institution, the St. Mary's pain center, and there was more than a mere scintilla of evidence that Bell lawfully consumed some of the pills. As the government concedes, she passed occasional opiate testing and pill counts during her appointments, and her granddaughter Christy testified that she had seen Bell take oxycodone. To the extent Bell and her co-conspirators conspired to possess with intent to distribute or to distribute a particular quantity of her pills, Bell could be sentenced for that quantity, as could Gibson (or any other similarly-situated co-conspirator) to the extent the quantity was reasonably foreseeable and in furtherance of the jointly undertaken criminal activity. Similarly, to the extent Gibson herself possessed oxycodone, she could be sentenced for that full amount, because there is no suggestion that Gibson could lawfully possess any quantity of the drug. But absent a finding (adequately supported by reliable evidence) that the entire quantity prescribed to Bell was "within the scope of the criminal activity" she and her co-conspirators undertook, *see* U.S.S.G. § 1B1.3 cmt. n.2, it would be improper to include in the drug quantity pills Bell lawfully consumed—both as to Bell, who lawfully possessed and consumed at least a portion

of the oxycodone prescribed to her, and as to Gibson, whose sentence, like Bell's, was calculated based on the full amount prescribed to Bell.[7]

None of the above analysis is surprising because it is clear that the government and the district court recognized the need for some inquiry beyond finding the sum total of Bell's pre-scriptions. After all, the government presented the co-conspirators' testimony, and the district court considered that testimony; if the court had been relying exclusively on the prescription records there would have been no reason to con-sider that testimony (or to take a reduction from the total drug weight based on that testimony and the other evidence in the record). But the nature of the court's consideration of that tes-timony and any specific calculations from it are simply not reflected in the record, hampering our ability to review the sentence for procedural reasonableness.

The extent of the district court's explanation for its 700-kilogram-of-marijuana finding was the following. The court "credit[ed] [the witnesses'] testimony in regard to the quantity of drugs" despite any "discrepancies" because to the extent there were discrepancies they were "not material." The court then accepted "the upper level" of the amounts testified to because those amounts were "corroborated by" the quantity prescribed to Bell. In conclusion, but rather inexplicably, the court "partially sustain[ed]" the Appellants' objection to the total drug quantity and found that Bell "was responsible for

---

[7]Because the government does not genuinely dispute that Bell obtained all of her pills using prescriptions issued by physicians at St. Mary's, there is no allegation that she engaged in so-called "doctor shopping," secretly obtaining prescriptions from multiple physicians. We need not, and there-fore do not, decide whether such conduct would have rendered the full amount prescribed "within the scope of the criminal activity," or at least rendered the quantity of legitimately obtained pills sufficiently de minimis that the full amount received could constitute a reasonable approximation of the scope of the criminal activity.

distribution of at least 700 kilograms equivalency of marijuana."

There is no explanation in the record of any of several underlying factual findings, at least some of which would have been necessary to reach the 700-kilogram number, including: (1) the range of sales each witness testified to; (2) the time period during which each witness purchased oxycodone from the Appellants, bearing in mind that there was no testimony as to transactions at the front end or the tail end of the charged conspiracy, *see supra* n.3; (3) the sum of the "upper limit[s]" and lower limits of each witness's testimony; (4) an approximation of the quantity of prescribed pills Bell herself consumed; and (5) whether (a) Bell and Gibson were also distributing pills prescribed to Bell's husband, (b) the pills Kim Smith and Tim Pace described were the same or different pills and whether their maximum per-month quantity was 40 or 60 or some other number, (c) the pills Joyce and Timothy Hopkins described were the same or different pills, and (d) Misty Parker re-sold some of the pills she bought to Leslie Clasby and/or Joyce Hopkins.[8] In short, to support its

(Text continued on page 25)

---

**[8][This footnote expresses solely the views of Judge Davis]**

I hasten to make two observations. First, I do not suggest that any one or more of the specific queries listed above is or should be either a necessary or a sufficient basis for a permissible finding of drug quantity in any particular case. Like relevant conduct in any case, the district court approaches its task based on the facts and circumstances presented. Second, I recognize that some of these queries, such as the quantity Bell herself consumed, may be more difficult for the government to prove than others. But that does not relieve the government of proving such facts by a preponderance of the evidence at sentencing. *See Randall*, 171 F.3d at 210.

A majority of the panel declines to join in this footnote but otherwise joins in this opinion for the court. *See post* (Hamilton, J., concurring). I am at a loss to understand my good colleagues' concerns over my forthright acknowledgement in this footnote that part of the government's burden in the circumstances of this case may include offering evidence upon which the district court might reasonably infer how much of her pre-

scribed oxycodone Appellant Bell did (or did not) consume herself. *Indeed, that is the very burden the government rightfully assumed in calling six co-conspirator witnesses to testify at the sentencing hearing: to provide an evidentiary basis for the district court to infer total drug quantity.*

In saying as it does that "I read nothing in the court's opinion that says a defendant is relieved of her obligation to produce some evidence concerning her personal consumption once the government establishes, by a preponderance of the evidence, that an otherwise valid prescription was part of the conduct of the conspiracy, with the government shouldering the ultimate burden of proof on the question of drug quantity," the concurrence confuses our holding. Perhaps in some future case we might be required to decide whether a defendant in circumstances similar to Bell's bears a burden of production as to his or her personal consumption of a validly prescribed medication. But that question is not before us; in this case, whatever burden of production Appellant Bell may have had was satisfied by the very evidence produced by the government itself, along with the drug screens and evidence of her longstanding legitimate medical needs. Thus, to the extent the concurrence purports to announce a rule imposing an "obligation" on such a defendant to produce evidence of personal consumption at sentencing, it constitutes mere *dicta* and, in any event, was not argued by the government. The problem is compounded by the fact that the case the concurrence relies upon, *Asch*, 207 F.3d at 1246, is clearly distinguishable, *see supra* at 18-19, and the statement from the case *Asch* relied upon, *United States v. Wyss*, 147 F.3d 631, 633 (7th Cir. 1998), was not only *dicta* but was also clearly labeled as such. *See id.* ("Maybe, when the defendant buys drugs both for his own consumption and for resale, he has some burden of producing evidence concerning the amount that he consumed . . . . This we need not decide."); *see also* Pierre N. Leval, *Judging Under The Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1268-69 (2006) (criticizing the "progressive distortion" through which "a hint becomes a suggestion, is loosely turned into dictum and finally elevated to a decision") (quoting *United States v. Rabinowitz*, 339 U.S. 56, 75 (1950) (Frankfurter, J., dissenting)).

To the extent the concurrence is instead advising district judges on how to draw inferences from evidence at sentencing, they hardly need our instruction on that ordinary task in which they engage daily; I have no doubt they are already well-equipped to call fanciful defense assertions that large quantities of narcotics were consumed by the defendant what they are: fanciful assertions.

finding that the conspiracy's total drug quantity was the equivalent of 700 kilograms of marijuana, the district court was obliged to explain how the witnesses' testimony, together with the prescription records and other probative evidence before it, proved by a preponderance that the equivalent of 2,612 40-mg pills of oxycodone was "within the scope of the criminal activity" undertaken by the Appellants and their co-conspirators. This the district court failed to do, requiring that we remand for resentencing.[9]

D.

Recognizing that the evidence plainly supports a finding that Bell consumed some of the pills and that the district court's explanation may have been inadequate, the government offers two final arguments. First, it argues that to be "legally obtained" prescription narcotics must be medically necessary, and because Bell sold most of her prescribed pills, the pills were not medically necessary and therefore were not legally obtained. But that argument proves too much. Initially, we can discern no good reason to craft a rule that any prescription drug that is sold illegally by the patient who obtains the prescription to another without a prescription is "medically unnecessary" to the patient as a matter of law. Second, even if we were to agree that a mere sale or transfer of a portion of the pills covered by a prescription renders that portion medically unnecessary, there is no good reason to say that *all* pills in the prescription are rendered medically unnecessary. So viewed in this case, although at least some, perhaps most, of the pills were medically unnecessary, that does not prove that all of them were medically unnecessary. Thus, we reject the government's contention.

---

[9]Although procedural sentencing errors can be harmless under the standard provided by Federal Rule of Criminal Procedure 52(a), *see United States v. Lynn*, 592 F.3d 572, 576 (4th Cir. 2010), the government does not argue that if there is error here the error was harmless.

Second, the government seeks to minimize the absence of findings on the record through its own *ex post* reconstruction of what the district court's calculations must have been to reach its decision to attribute the equivalent of 700 kilograms to the conspiracy. As we have explained, however, "an appellate court may not guess at the district court's rationale, searching the record for statements by the Government or defense counsel or for any other clues that might explain a sentence." *Carter*, 564 F.3d at 329-30. The Supreme Court's recent sentencing jurisprudence "plainly precludes any presumption that, when imposing a sentence, the district court has silently adopted arguments presented by a party." *Id.* at 329. "Rather, 'the district judge,' not an appellate court, 'must make an individualized assessment based on the facts presented' to him.'" *Id.* (quoting *Gall*, 552 U.S. at 49-50).

We emphasize that none of this is to say, of course, that the district court should have disregarded Bell's prescription records in calculating drug quantity, or even that on remand the district court will be precluded from reaching the same total drug weight. Plainly, the amount Bell received was a reasonable starting point; and, a district court's rough approximation (as reflected here by the court's near 45% reduction in the PSR's recommended drug weight) will in many cases pass muster. But under the circumstances presented in this record, without a clear factual finding on how much of the prescription Bell herself consumed and/or some other factual basis reflecting the court's assessment of the co-conspirator testimony to show that 104.5 grams was the amount of oxycodone the conspiracy members unlawfully possessed with intent to distribute, there is an unacceptably high risk that the relevant total drug weight may have been inflated.

## IV.

Gibson offers another, separate, challenge to her own sentence. Gibson argues that, whatever the total drug quantity attributable to the conspiracy might be, the district court erred

in holding her responsible at sentencing for that full amount. She argues the evidence showed that she was involved in drug sales only beginning in or after May 2008, and therefore only pills sold between May 2008 and July 2009 should have been attributed to her.

As stated above, because the record does not adequately support the district court's calculation of the conspiracy's total drug quantity, we are vacating each Appellant's sentence. Thus, the district court will have the opportunity in any event to revisit the evidence of the extent and timing of Gibson's involvement in the conspiracy. We note, however, that the district court's rejection of Gibson's argument turned on its finding that Gibson "had full knowledge of the scope of the conspiracy and quantity of drugs involved." J.A. 427. Gibson's "knowledge" of the scope of Bell's drug sales, however, is only part of the analysis; under the Guidelines the full amount of oxycodone sold or transferred by Bell is only attributable to Gibson for drug weight purposes if that full amount was reasonably foreseeable to Gibson and within the scope of the criminal activity that she jointly undertook with Bell. *See* U.S.S.G. § 1B1.3 cmt. n.2. Moreover, if Gibson did not join the conspiracy until May 2008, oxycodone distributed by Bell or other conspiracy members before that date could not be considered "relevant conduct," even if Gibson knew of that conduct. *Id.*

On remand the district court may well decide as a factual matter that Gibson's conduct satisfies the standard for attributing to her the full amount possessed by conspiracy members with intent to distribute. After all, although the trailer park lease presented at sentencing was from May 2008 and there was evidence Gibson lived somewhere else at some point in the years prior to 2008, there was no evidence of where she lived between approximately 2005 and May 2008. Moreover, the district court acknowledged that there were some "discrepancies in the testimony of witnesses based on a lack of memory" as to the precise nature of Gibson's involve-

ment, and "accept[ed] their testimony in spite of that." J.A. 427. Nonetheless, because we cannot reliably determine from the record whether the district court found that the full quantity of pills attributable to Bell was "reasonably foreseeable" to Gibson and "within the scope of the criminal activity that [she] jointly undertook," U.S.S.G. § 1B1.3 cmt. n.2, we are unable to affirm the district court's decision to attribute the full amount to Gibson.

V.

For the foregoing reasons, we vacate the judgments and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

HAMILTON, Senior Circuit Judge, concurring in part and concurring in the judgment:

I concur in the court's opinion except Footnote 8. I write separately to make two observations. First, the court's opinion in this fact-intensive case is limited to a situation in which a defendant (here, Bell) obtained drugs and then entered into an agreement with codefendants (here, Gibson and others) to possess with the intent to distribute a *portion* of those drugs. For obvious reasons, the reasonably foreseeable quantities within the scope of the criminal activity the defendant and the downstream codefendants agreed to undertake do not involve the amount the defendant withheld for personal consumption. Second, I read nothing in the court's opinion that says a defendant is relieved of her obligation to produce some evidence concerning her personal consumption once the government establishes, by a preponderance of the evidence, that an otherwise valid prescription was part of the conduct of the conspiracy, with the government shouldering the ultimate burden of proof on the question of drug quantity. *See, e.g.*, *United States v. Asch*, 207 F.3d 1238, 1246 (10th Cir. 2000) ("Although the defendant bears the burden of producing evi-

dence of her intent to consume, we emphasize that the ulti-mate burden of proof on the quantity of drugs involved in the offense remains with the government at all times.").

I am authorized to state that Judge Floyd joins in this opin-ion.